UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DARLEEN WILLIS o/b/o A.A.**,  Case Number 4:12 CV 2687

    Plaintiff,

    v.  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.  MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Darleen Willis, on behalf of her minor child A.A., seeks judicial review of the Defendant Commissioner of Social Security's decision to deny social security income benefits (SSI). The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the undersigned affirms the Commissioner's decision denying benefits.

### PROCEDURAL HISTORY

On May 29, 2009, Plaintiff filed an application for SSI claiming A.A. was disabled due to diabetes mellitus, learning disabilities, and depression. (Tr. 97). Her claim was denied initially and on reconsideration. (Tr. 97, 104). At Plaintiff's request, a hearing was held before an administrative law judge (ALJ). (Tr. 112). Plaintiff and A.A., represented by counsel, testified at the hearing, after which the ALJ found A.A. not disabled. (Tr. 29-53). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On October 26, 2012, Plaintiff filed the instant case. (Doc. 1).[1]

**FACTUAL BACKGROUND**

*Educational Background*

From kindergarten through second grade, A.A. generally earned average grades and accrued modest absences at Lincoln Elementary. (Tr. 608-10). In third grade, A.A. averaged a D in reading and math, C in language and spelling, and S (satisfactory) in science, health, social studies, art, physical education, vocal music, and library media technology. (Tr. 606). She was absent 32 times. (Tr. 606).

A.A. was placed under an Individualized Education Plan (IEP) in fourth grade, effective from November 7, 2005 through June 1, 2006, because A.A. was falling behind in all subjects except handwriting, and had a difficult time controlling her sugar levels. (Tr. 585, 631). On the Wechsler Intelligence Scale for Children VI (WISC VI), she scored below the 25th percentile in all areas. (Tr. 585). Her IEP set forth goals to improve in reading, language, writing, and math; and to gain better control of her diabetes. (Tr. 586-92). A.A. was assigned a special education teacher for one period per day and was also allowed certain modifications for statewide testing including an alternative setting, directions read aloud, extended time, and use of a calculator or multiplication chart. (Tr. 586-91, 594).

---

1. The Court notes that while preparing to file this Memorandum Opinion and Order, Plaintiff filed a Notice Regarding Subsequent Application notifying the Court that A.A. received a Fully Favorable Decision on October 25, 2013. (Doc. 20). By its own terms, the October 25, 2013 ALJ decision is not a basis for reopening the instant application, does not apply to the time period at issue, and is based on "new evidence showing progression of the claimant's impairments." (Doc. 20-1, at 5).

In fourth grade, A.A. averaged B's and C's except for a D in science and health, and an F in social studies. (Tr. 660). Because she had been absent 43 days throughout the year, 25 more than permitted by school policy, she was retained in fourth grade. (Tr. 74, 596, 660, 663).

During the 2006-2007 school year, A.A. remained under an IEP and her goals were the same as the year before because many had not been met. (Tr. 663). During her second fourth grade year, she earned A's and B's, was on the merit roll and honor roll, and showed improvement, despite accruing 44 absences. (Tr. 172). She scored "basic" in reading, and "proficient" in mathematics and writing on Ohio Achievement Tests. (Tr. 141).

A.A. was promoted to fifth grade at Maplewood Middle School, where she continued to have excessive absences. (Tr. 563-64, 624). She was placed in special education classes for 21 to 60 percent of the day, was noted to be "age-appropriate" for grade level, but had problems managing her diabetes. (Tr. 565-67). At the end of the third quarter, A.A. was earning A's, B's, and C's. (Tr. 233).

In sixth grade, A.A. left Maplewood and enrolled in Champion Local School District. (Tr. 143). An IEP, effective September 3, 2008 through May 30, 2009, adopted the previous year's goals, generally to improve reading-content and processes, language-writing process, number-sense, life skills, and study skills. (Tr. 144-48). A.A. scored in the fourteenth percentile for her age nationally on the Iowa Tests of Basic Skills. (Tr. 139). She earned an A in art and band, B in math and science, and D in language arts. (Tr. 234). She was absent 30.5 days throughout her sixth grade year. (Tr. 234).

On October 23, 2008, while in sixth grade, an Evaluation Team Report (ETR) was completed. (Tr. 151). At the time, A.A. received direct instruction from a special education teacher in reading, math, and language arts; but was in a regular education classroom for science

3

and social studies. (Tr. 152, 155-56). A.A. was "confident and outgoing in class", did not have social problems, could follow multi-step oral directions, had strong organization, little difficulty writing paragraphs, and could solve multi-step math equations in a self-contained classroom. (Tr. 152, 155, 157). However, A.A. struggled in social studies and science due to low quiz scores, poor attendance, and failure to take advantage of extra credit opportunities or self-advocate. (Tr. 157-58).

As part of the ETR, Paul McCabe, MS, CCC-SLP, assessed A.A.'s communication abilities and indicated she responded appropriately to test questions; had below average vocabulary, comprehension, and oral expression; had low average expressive vocabulary; and was able to make conversation, ask and answer questions, ask clarifying questions, follow multi-step directions, and write sentences and paragraphs of longer length and substance. (Tr. 159). Mr. McCabe concluded A.A.'s speech and language skills did not have an adverse effect on her educational performance. (Tr. 159).

Also as part of the ETR, A.A. took the Woodcock-Johnson III Test of Achievement on September 9, 2008, wherein her scores generally ranged from average to low average in comparison to peers of the same age. (Tr. 160).

Lisa C. Garvin, school psychologist, assessed A.A.'s emotional status for the ETR on October 21, 2008. (Tr. 163-64). With regard to social-emotional information, Ms. Garvin indicated A.A. had a short attention span, was easily distracted, had difficulty keeping up in class, and had spelling and reading difficulties. (Tr. 163). Ms. Garvin also administered the WISC-VI, wherein A.A.'s full scale IQ was 79, within the borderline/low average range and eighth percentile relative to her peers. (Tr. 165). During the assessment, Ms. Garvin indicated A.A. was cooperative, had appropriate attention and concentration, but had low processing speed

4

and working memory skills. (Tr. 165-66). Finally, she indicated A.A.'s verbal skills were at the low end of average compared to her peers. (Tr. 165).

On November 11, 2008, Karen Conkey, A.A.'s special education interventionist, indicated A.A.'s attendance had not been a problem that year, she worked cooperatively with others, could follow multi-step oral directions, and had low comprehension of recently read material. (Tr. 156). Although A.A. could answer literal questions to demonstrate comprehension, she struggled with inferential and evaluative questions and needed assistance from the teacher to complete an extended response question. (Tr. 156).

The ETR team concluded A.A. had a learning disability in reading decoding and reading comprehension. (Tr. 170).

A.A. remained under an IEP for her seventh grade year. (Tr. 125). At the time of implementation in May 2009, A.A. read at the Fountes and Pinnell guided reading level of V (87%), which was consistent with a sixth grade level. (Tr. 125). Generally, she wrote at a fifth grade level and her math skills were at a fourth grade level. (Tr. 125). Her goals were to further develop math skills to meet grade level expectations and real-world demands (Tr. 127); utilize strategies to increase reading comprehension skills (Tr. 129); and develop and expand her writing mechanics to meet grade level demands (Tr. 131). She was in special education for math, but remained in regular classrooms with consultation between a regular education instructor and intervention specialist for reading instruction and written expression, had in-class support for science, and had supplemental support in a small group setting during scheduled study halls. (Tr. 127-31). She received accommodations or modifications in class and on state and district-wide testing. (Tr. 127, 129, 131, 133). In seventh grade, she earned a B in math and science; a C in


band; and a D in language arts, reading, and world history. (Tr. 235). She was absent 23 days during her seventh grade year. (Tr. 235).

A.A. was also under an IEP during her eighth grade year, effective from May 12, 2010 through May 11, 2011. (Tr. 332). A.A. was described as social and organized, but had difficulty processing verbal information and adequately understanding content area concepts through the use of words, particularly if she lacked prior experience with the content area vocabulary. (Tr. 334). She had annual goals in the areas of math (Tr. 336), written expression (Tr. 337), and reading (Tr. 338). On the Ohio Achievement Test, she received a proficient score in math and accelerated score in reading. (Tr. 336, 338). She had an intervention specialist for supplemental support and was moved out of special education for all direct instruction, although she was still provided with in-class accommodations and test modifications. (Tr. 339).

*Homes for Kids*

In 2009, A.A. was referred to Homes for Kids for counseling services and help adjusting to a custody change. (Tr. 425). Robert McBride, MS, MA, PCC-S, diagnosed adjustment disorder with mixed anxiety and depression, and oppositional defiant disorder (ODD), and assigned a global assessment of functioning (GAF) score of 54.[2] (Tr. 454).

Mr. McBride described A.A. as artistic, and indicated she enjoyed music, was helpful around the home, got along well with peers, was in band, and played baseball. (Tr. 426, 428). However, he later indicated A.A. had recently stopped participating in outdoor activities because

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR,* at 34.

she felt it was too cold to exercise or be outside. (Tr. 456). Mr. McBride noted A.A. was impatient; had occasional mood swings, hyperactivity, and trouble falling asleep; and had stress from the custody change and conflicts with her father. (Tr. 432). A.A. had problems with her primary support group and other psychological and environmental problems, was unwilling to open up and express feelings, had begun to slack in school, isolated herself, and was irritable. (Tr. 456).

Treatment notes indicated A.A. had an improved ability to identify triggers and situations that caused her to become angry, stopped blaming others, became less argumentative, had a better attitude, and improved ability to control her anger and verbalize her frustrations through role playing. (Tr. 457).

*Valley Counseling*

On December 8, 2009, A.A. went to Valley Counseling. (Tr. 487-90). She complained of mood swings, overreacting to "little stuff", and trouble with her grades because she did not do her homework. (Tr. 487, 505). She also said she was angry with her father. (Tr. 505). However, A.A. said she liked school, had friends, and denied social problems. (Tr. 505). She was assigned a GAF score of 51[3] and discharged on March 25, 2010 after she failed to return for further treatment. (Tr. 483-84, 506).

*Medical Evidence*

A.A. was diagnosed with Type I diabetes mellitus in 2004. (Tr. 184, 403). Since then, she was hospitalized twice for treatment on April 28, 2007 and June 8, 2007, and was assigned a child welfare services caseworker to help better manage her diabetes. (Tr. 184, 376, 388, 398, 403).

---

3. *DSM-IV-TR*, *supra* note 2.

On April 28, 2008, Naveen K. Uli, M.D., saw A.A. for an initial evaluation. (Tr. 413). A.A. complained of frequent headaches, stomach aches, and disturbed sleep patterns. (Tr. 414). Dr. Uli indicated her blood glucose levels were "quite elevated", with most of them between 200 and 500 mg/dL. (Tr. 413). He indicated her glucose levels had improved since diagnosis, but were still "suboptimal" and adjusted A.A.'s insulin regimen. (Tr. 414).

On July 16, 2008, Marcella Kootz, M.D., advised Angela Bartlett, A.A.'s caseworker, that A.A.'s blood glucose levels were in the 400s and 500s, indicating she was not getting insulin or not following prescribed meal plans. (Tr. 183).

Over the course of several follow up visits with Dr. Uli spanning from February 2008 through December 2009, A.A. controlled her diabetic symptoms, partially because she moved in with her mother. (Tr. 175-76, 178). On April 15, 2010, her glucose averages on two separate glucometers were 185 and 282 mg/dL and her HbA1c[4] was 7.6%, close to optimal. (Tr. 178, 510). On September 27, 2010, her blood glucose average was 232 and her HbA1c was 5.8%, but Dr. Uli noted frequent lows. (Tr. 540).

On a disability questionnaire completed March 24, 2011, Dr. Uli reported A.A. injected herself with insulin three to five times per day and had severe enough diabetic symptoms to "often" interfere with her attention and concentration. (Tr. 318).

*Third Party Statements*

On June 30, 2009, Plaintiff completed a function report for the Bureau of Disability Determination, where she indicated A.A.'s diabetes caused her to miss a lot of school and she

---

4. Glycosylated hemoglobin (HbA1c) measures a patient's average glucose level in the recent past. *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1349 (Fed. Cir. 2013). For children under age six, it should be under 8.5%; for children under age twelve, it should be under 8%; and for children under age nineteen, it should be under 7.5%. (Tr. 540).

was on an IEP to catch up. (Tr. 205). She said A.A. got along "very well" with friends and playmates, "always behave[d] well", and generally had no behavior problems at school. (Tr. 205, 207). She indicated A.A. could watch and understand a whole TV program (Tr. 207) but had trouble concentrating on what she was reading or completing complicated tasks (Tr. 207).

In March, 2011, A.A.'s aunts, Mari Carasi and Mary Wilson, completed questionnaires for the social security administration. (Tr. 252-59, 270-77). Generally, they described A.A. as lacking energy, being emotionally withdrawn from unfamiliar persons, experiencing mood swings, being forgetful, and having difficulty socializing. (Tr. 252-55, 258, 273, 276). A.A.'s neighbor, Charles Jackson Jr., also completed a series of questionnaires (Tr. 261-68), where he indicated A.A. was often depressed and would become tired, throw fits, experience panic attacks, and isolate herself in her room. (Tr. 261-62, 264).

On March 25, 2011, A.A.'s principal, Margaret Dolwick, rated A.A.'s reading and math level as "basic", and reported A.A. had special instruction in a regular classroom for one period per day but was otherwise in regular education classes without special instruction. (Tr. 322). With regard to acquiring and using information, she rated A.A. as having a serious problem in 3/10 areas, an obvious problem in 5/10 areas, and a slight problem in 2/10 areas. (Tr. 324). She did not indicate A.A. had a "very serious" problem in any area related to acquiring and using information. (Tr. 324). A.A. had fewer limitations in the remaining domains. (Tr. 325-28).

*State Agency Review*

On September 15, 2009, David L. Chiarella, PhD, performed a psychological evaluation. (Tr. 443). Plaintiff complained A.A. had "explosive outbursts", diabetes Type 1, depression, and a learning disability; and did not have problems at school, except for occasional "harass[ment]" for being a Type 1 diabetic. (Tr. 443-44). A.A.'s study habits were fair, but her attendance was

9

problematic. (Tr. 444). A.A. enjoyed swimming and being active; and was able to attend, concentrate, and persist in goal-directed activity. (Tr. 444). According to A.A., her depression was the result of problems with her dad and her attitude. (Tr. 444). Although A.A. complained of being teased, she said she had friends. (Tr. 444).

On the WISC-IV, A.A. had a full scale IQ of 81 and her intellectual skills were within the "borderline" range. (Tr. 445). Her adaptive behaviors were adequate but she demonstrated a relative weakness in her written communications skills. (Tr. 445). Her cognitive skills were developed at slightly more than three-quarters of her age expectations and her communication skills were age appropriate. (Tr. 445). She was able to use and understand conversational speech, her speech was intelligible 100% of the time in an unknown context, and her socialization skills were age appropriate. (Tr. 445). Dr. Chiarella diagnosed adjustment disorder with depressed mood; adjustment disorder with mixed disturbance of emotions and conduct; learning disorder, NOS; and borderline intellectual skills. (Tr. 445-46). He assigned a GAF of 55.[5] (Tr. 446).

John L. Mormol, M.D., and Alice Cambly, Psy.D., jointly submitted a childhood disability evaluation form completed on October 14, 2009 and October 8, 2009, respectively. (Tr. 447-52). They found that none of A.A.'s severe impairments or combination of impairments met or equaled the listings. (Tr. 447).

A.A. had less than marked limitation in her ability to use and acquire information because her reading level was 97% commensurate with 6th grade, she was able to summarize information in a text, she could make inferences based on implicit information, she demonstrated comprehension at age appropriate levels, number system was at 70% accuracy, she required

---

5. *DSM-IV-TR*, *supra* note 2.

some special help in mathematics but was otherwise in regular education classes, and she had a full scale IQ of 81. (Tr. 449).

Further, they found A.A. had no limitation attending and completing tasks. (Tr. 449). As support, they cited the Homes for Kids report which said A.A. was artistic, enjoyed music, helped around the house, and was in band and played basketball. (Tr. 449). Her IEP indicated she could analyze and solve multi-step problems including addition, subtraction, multiplication, and division; could follow oral and written instructions; and stay focused on tasks until they were completed nine out of ten times. (Tr. 449). She had less than marked difficulty relating to others and no limitation moving about and manipulating objects or caring for herself. (Tr. 449-50). She had less than marked difficulty in health and physical well being due to her diabetes. (Tr. 450).

Michael Stock, M.D., and Aracelis Rivera, Psy.D., affirmed the disability determination on May 12, 2010 and April 12, 2010, respectively. (Tr. 515-19).

*Testimony*

A.A. was fourteen years old and in eighth grade at the time of the hearing. (Tr. 58). She alleged severe impairments including Type I diabetes, adjustment disorder, abdominal pain, OED, a learning disorder, borderline intellectual functioning, obesity, depression, and mood disorder. (Tr. 58). A.A. felt she had a significant problem with maintaining her diet and sugar levels, moods swings, and math. (Tr. 63-64). At times, A.A. said she went skating with one of her friends or went to the mall with her mom, but she usually stayed in her room, texted, and painted her nails after school. (Tr. 61-62).

A.A. lived with her father for twelve years before coming into Plaintiff's custody two years ago. (Tr. 66, 81). Plaintiff testified A.A. was limited socially, having only left home once

11

in the past two years to be with friends. (Tr. 66). She also said A.A. experienced mood swings after school and often isolated herself in her bedroom. (Tr. 67-70).

Plaintiff testified A.A. became winded during softball, bike rides, and walks; had no problems taking care of herself; but had difficulty self-administering her insulin. (Tr. 66, 81-83). Plaintiff received regular calls from the school nurse regarding A.A.'s sugar levels. (Tr. 86-87).

Socially, Plaintiff testified A.A. had difficulty maintaining friendships and close relationships with family because she was moody, shy, and did not show affection. (Tr. 66, 75-76, 79-80). A.A. did chores about half the time, which included loading the dishwasher, cleaning the kitchen, doing her laundry, and picking up after herself. (Tr. 76). When A.A.'s chores were not completed, it was because she did not feel good, or threw a fit and stormed off to her room. (Tr. 76-77). Plaintiff said A.A. was shy around new people, disorganized, did not watch T.V. or movies, did not read, and had trouble retaining what people said. (Tr. 77-79).

A.A. was held back in school because of significant absences, but her absenteeism had improved since Plaintiff gained custody. (Tr. 74). Plaintiff testified that A.A.'s grades had significantly improved over the previous year's and were "really good." (Tr. 74).

*ALJ Decision*

On June 19, 2012, the ALJ determined A.A. had the following severe impairments: Type I diabetes, adjustment disorder, learning disorder, and borderline intellectual functioning. (Tr. 35). To determine functional equivalence, the ALJ analyzed the record and found A.A. had marked limitations in health and physical well-being and less than marked or no limitations in every other relevant functional domain. (Tr. 35-48). The ALJ found A.A. not disabled. (Tr. 48).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR CHILDHOOD DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

A child's SSI claim undergoes a three-step review process. 20 C.F.R. § 416.924(a). These steps determine whether: 1) the child is engaged in substantial gainful activity; 2) there is a severe impairment or combination of impairments; and 3) the severe impairment, or combination of impairments, medically or functionally equals the Listing of Impairments. 20 C.F.R. §§ 416.924(a)-(d). Under 20 C.F.R. § 416.926a, "if a child's impairment – or combination of impairments – does not meet or is not medically equivalent in severity to a listed impairment,

13

then the Commissioner will assess all functional limitations caused by the impairment to determine if the child's impairments are functionally equivalent in severity to any of the listed impairments of Appendix 1" (i.e. "functional equivalency"). *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003).

Functional equivalency is measured under six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i-vi). This approach, called the "whole child approach", accounts for the effects of a child's impairments singly and in combination. *Fleming v. Comm'r of Soc. Sec.*, 2013 WL 821262, at *5 (N.D. Ohio 2013).

To be disabled, Plaintiff must demonstrate a "marked" limitation in two domains or an "extreme" limitation in one. §§ 416.926a(a), (d). A "marked" limitation may be demonstrated by two means relevant to this matter. One is "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and . . . day-to-day functioning in domain-related activities is consistent with that score. § 416.926a(e)(2)(iii). Alternatively, "marked" limitation is shown "in a domain when [the child's] impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(2)(i).

In determining the severity of impairments within a given domain, an ALJ is to consider the effect a structured or supportive setting has on a child's ability to function. Social Security Ruling (SSR) 09-1p explains:

> It is important to determine the extent to which an impairment(s) compromises a child's ability to independently initiate, sustain, and complete activities. To do so, we consider the kinds of help or support the child needs in order to function. *See*

> 20 CFR 416.924a(b). In general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make [her] functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if [she] is functioning well with the help or support.
>
> The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be.

SSR 09-1P, 2009 WL 396031 at *6-7; *see also* 20 C.F.R. §§ 416.924a(b)(5)(E)(ii); 416.924a(b)(5)(E)(iv)(C)[6]; 416.924a(b)(5)(E)(iv)(E)[7]; 416.924a(b)(7)(iv) ("The fact that you do or do not receive special education services does not, in itself, establish your actual limitations or abilities. . . . [W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments.").

To summarize, the extent of structured or supportive services a child needs to function is directly related to the severity of his or her limitation. Accordingly, a child who is able to function at the same level as her unlimited peers with minimal support will usually have a less severe limitation in any given domain than a child who requires extensive support to function at the same level.

---

6. "A structured or supportive setting [including special education services or an IEP] may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting. Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting."

7. "Therefore, if your symptoms or signs are controlled or reduced in a structured setting, we will consider how well you are functioning in the setting and the nature of the setting in which you are functioning (e.g., home or a special class); the amount of help you need from your parents, teachers, or others to function as well as you do; adjustments you make to structure your environment; and how you would function without the structured or supportive setting."

DISCUSSION

*Acquiring and Using Information*

Plaintiff argues the ALJ committed "clear legal errors" by evaluating "A.A.'s abilities within [the acquiring and using information] domain in isolation, without considering how she would function without help from her IEP." (Doc. 16, at 14); *see also* (Doc. 19, at 2-3). Plaintiff's only discussion related to substantial evidence is that the ALJ's "decision is founded on errors of law and his step-three analysis denial lacks support from substantial evidence." (Doc. 16, at 14). For her part, the Commissioner argues the ALJ's decision is supported by substantial evidence, and briefly notes the ALJ "did not evaluate the disputed domain in isolation." (Doc. 17, at 14-16).

The domain of acquiring and using information addresses how well a child is able to learn information and then use the information she has learned. 20 C.F.R. § 416.926a(g). The regulations describe this domain for A.A.'s age bracket, referred to as adolescents (age 12 to 18):

> In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas).

20 C.F.R. § 416.926a(g)(2)(v).

In this case, the ALJ determined A.A. had less than marked limitations in acquiring and using information. (Tr. 42). As support, the ALJ indicated A.A. progressed to fewer special education classes, her grades improved, she consistently cared for her diabetes, attended school on a regular basis, understood instructions, and could watch and understand an entire television program. (Tr. 42). The ALJ also suggested A.A. was capable of overcoming any deficiencies in

this domain, evidenced by the fact her achievement improved when she attended school regularly. (Tr. 42).

Plainly, the ALJ's analysis was not confined to school records. Rather, the ALJ cited to medical records, Plaintiff's testimony, school records, daily activities, and the amount of structured or supportive services given. (Tr. 42); *see Worwell v. Astrue,* 2012 WL 669974, at *5 (N.D. Ohio 2012) (SSR 09-01p, does not require adjudicators "to discuss all of the considerations in the sections below in their determinations and decisions, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.").

Furthermore, as the Commissioner points out, the ALJ cited the reports of state-agency professionals in his determination, who expressly compared A.A.'s abilities to those of her peers to conclude A.A. had less than marked limitations in all domains. (Tr. 40); (Tr. 447-52) (considered A.A.'s sixth grade reading level, extent of special education services received, and full scale IQ of 81); (Tr. 443-46) (concluded A.A.'s cognitive skills were developed at slightly more than three-fourths of her age expectation, her communication was good, and she had good ability to attend and concentrate). Therefore, despite Plaintiff's claim, the ALJ did not in fact consider A.A.'s abilities within the domain of acquiring and using information "in isolation".

Even if the ALJ failed to consider the impact of A.A.'s special education classes or IEP on her impairments, the ALJ's conclusion that A.A.'s limitation in this domain is less than marked is supported by substantial evidence. *See, NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.9 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality.").

With respect to opinions directed squarely at the domain of acquiring and using

17

information, A.A.'s principal, Margaret Dolwick, indicated A.A. generally had less than marked limitations (Tr. 324); as did the state agency examiners (Tr. 444, 449); a teacher from William S. Guy Middle School (Tr. 243-44); and the ETR team, who said A.A. was able to follow multi-step math problems, had little difficulty writing paragraphs, and could follow multi-step oral directions (Tr. 152, 155, 157, 159).

As the ALJ pointed out, A.A. progressed to fewer special education classes by her eighth grade year, when she no longer received any direct instruction from a special education teacher, and received only supplemental support from an intervention specialist. (Tr. 64, 229, 339). This was certainly less support than A.A. had in previous years. For example, in seventh grade, she received direct instruction from her special education teacher in math (Tr. 127-31, 332) and in sixth grade, she received direct instruction in math, reading, and language arts. (Tr. 152, 155-56).

Furthermore, the record shows A.A.'s grades had improved. (Tr. 74, 235, 243-44). While in eighth grade, her guidance counselor indicated she was "doing very well" (Tr. 230), and Plaintiff testified A.A.'s grades were "really good" (Tr. 74). In seventh grade, her grades ranged from D's to B's while she was in all regular classes except for math (Tr. 235); and in sixth grade, she earned mainly A's and B's, with only one D. (Tr. 234). Objectively, her scores on the Woodcock-Johnson test improved, as did her scores on the Ohio Achievement Tests. (Tr. 141, 143, 336, 338). According to her seventh grade IEP, she was able to read and write with high percentages of accuracy. (Tr. 125-26).

By Plaintiff's own admission, A.A.'s trouble in school was due to excessive absences largely caused by her health problems. (Tr. 74, 86, 170). However, as the ALJ noted, A.A. had recently been able to better manage her diabetes, and her HbA1c levels were near or below the target levels. (Tr. 175-76, 178, 510, 540).

As a final note, although there is evidence in the record that A.A. had some limitation in the domain of acquiring and using information, this Court may only consider whether there is substantial evidence to support the ALJ's conclusion. (Tr. 139, 163-67); *see Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports that ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal quotation marks and citation omitted).

By not limiting his analysis to school records, the ALJ properly considered the effect structured or supportive settings had on A.A.'s abilities. Furthermore, the ALJ's determination that A.A. had less than marked impairments in the domain of acquiring and using information is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the determinations of the Commissioner supported by substantial evidence and consistent with the relative sections of the Code of Federal Regulations. Therefore, the decision of the Commissioner denying benefits is affirmed.

IT IS SO ORDERED.

    s/James R. Knepp II
United States Magistrate Judge